ERVIN S. FERRY, Appellant, v. CLARA B. WOODY, Administratrix, Respondent.

In the Kansas City Court of Appeals, May 1, 1922.

1. **SALES: Bills and Notes: Evidence Held Sufficient to Warrant Submission of Question of Fraud in procurement of Promissory Notes.** In an action upon promissory notes given by deceased in payment of a stallion which seller guaranteed in writing, *held* there was sufficient evidence from which the jury could say there was fraud in the procurement of notes, and it was immaterial that all negotiations and representations were merged in written guarantee which provided only remedy open to buyer in case of a breach.

2. **WITNESSES: Deposition: Where Deposition of Deceased Maker, Inadmissible Because of His Death, Was Introduced in Evidence, the Testimony of Plaintiff as to Matters Testified to by Deceased in Deposition Thereby Became Admissible.** Where the deposition of deceased, the maker of the notes, was introduced in evidence, the same not having been admissible because of the death of maker, the testimony of plaintiff as to matters testified to by deceased in his deposition was rendered thereby admissible.

3. **BILLS AND NOTES: Affidavit of Payee Held to Eestablish Only Naked Indorsement.** In view of section 5390, Revised Statutes 1919, providing that when it is necessary to prove an assignment of a note an affidavit of a competent witness, proving the same shall be received as prima-facie evidence, the affidavit of the payee of a note, introduced in evidence, established only the naked indorsement.

Ferry v. Woody.

4. ———: Holder in Due Course: Burden of Proof: Where Evidence Tends to Show Fraud in Procurement of Promissory Note, Holder Has Burden of Showing That He Acquired Title as Holder in Due Course. Under section 845, Revised Statutes 1919, providing every holder is deemed prima-facie to be a holder in due course, except when title is shown to be defective, and section 841, Revised Statutes 1919, providing that title is defective when note is obtained by fraud and section 838, Revised Statutes 1919, defining a holder in due course, where maker shows note was procured by fraud, the burden was upon holder to prove that he acquired the title as holder in due course.

Appeal from the Circuit Court of Vernon County.—*Hon.* *B. G. Thurman,* Judge.

AFFIRMED.

*A. E. Elliott* for appellant.

*W. M. Bowker* for respondent.

BLAND, J.—This is an action upon two promissory notes in the sum of $500 each, dated Nevada, Missouri, April 1, 1912, payable to the order of Oltmanns Bros. at the First National Bank, Nevada, Missouri, and executed by George W. Woody. One of these notes was due September 1, 1913, and the other on September 1, 1914. The notes were assigned to plaintiff. The maker died after this suit was filed and defendant was appointed administratrix of his estate. There was a verdict and judgment for the defendant and plaintiff has appealed.

The answer, among other things, pleads fraud in the procurement of the notes. Before his death the deposition of George W. Woody was taken and was introduced in evidence. From this deposition it appears that the notes were given by deceased in payment of a stallion which he purchased in Nevada, Missouri, from one Tate, a salesman of Oltmanns Bros. The deceased saw the horse about two weeks before he purchased it and at that time Tate told him that he would guarantee the stallion to be a good breeder. Tate told deceased "the

stallion is absolutely sure, sure as a goat.'' He guaranteed the horse to be sixty per cent foal getter. Deceased then agreed to take it.

On the day the notes were executed by deceased and the horse was delivered to him, a written guarantee was given deceased by Oltmanns Bros. which provided—

''The said party of the first part hereby guarantees said Percheron Stallion Alright 81065 with proper care and handling, and bred to healthy producing mares, to be at least a 60 per cent foal getter.

''If said horse does not prove to be as represented the said party of the first part hereby covenants and agrees to replace said horse. . . . with another Percheron Stallion equally as good or refund the notes to said second party, provided said second party shall return said stallion to said first party in as good health and condition on or before March 1, 1913, as when said stallion was delivered to second party.''

The evidence shows that deceased took the stallion home and although it was handled with proper care and bred to healthy producing mares it proved to be practically useless as a foal getter. Oltmanns Bros. were located at Wateseka, Illinois. Deceased wrote them telling them that the horse was not a foal getter and they requested him to come to Wateseka and select another horse which they would ship to him at Nevada, and deceased could return the first horse to them at the latter place. He went to Wateseka at his own expense and looked at the horses shown him, which consisted of one stallion and some two-year old colts but deceased testified that they were not as good as the horse he bought. During the season of 1914 deceased offered several times to return the stallion to Oltmanns Bros. but they wanted him to go to Ft. Worth, Texas, to see another horse they had there but deceased did not go. Deceased testified that he had no fault to find with the stallion except that it was not a foal getter. He testified that at the time his testimony was given he was not attempting to breed the stallion at all but was keeping him in the barn where he fed him

but that the stallion was absolutely worthless to him for any purpose.

Plaintiff's deposition was introduced in evidence over the objection of defendant. This deposition was taken before the death of George W. Woody. The deposition contains evidence tending to show that plaintiff purchased, on June 4, 1912, the two notes sued upon, before maturity and in good faith and for value, and at the time they were negotiated to him he had no notice of any defense on the part of the maker of the notes on account of any transactions out of which they grew.

Plaintiff contends that the only objection deceased had to the horse was that it was not a foal getter; that all negotiations and representations in regard to this matter were merged into the written guarantee and that the guarantee provided the remedy that deceased should have in case the stallion did not meet with its terms, that there was no defense to this suit upon the notes and that the court should have given plaintiff's instructions directing a verdict for plaintiff. In this connection plaintiff complains of the giving of defendant's instruction No. 6, which submitted to the jury as grounds of defense the question of fraud in the procurement of the notes founded upon the representations of Tate that the stallion was a sure foal getter and a 60 per cent foal getter, and guaranteed to deceased to be such, and that if the stallion did not meet the guarantee that the sellers would give deceased another stallion equally as good or return him his notes; that said representations were relied upon and were false or recklessly made and that the guarantee was not complied with and was fraudulently made without any intention of complying with the same. It is claimed that this instruction ignores the written contract, in the form of the guarantee, in that the guarantee provides for a remedy in case of its breach.

We think there is no question in this case but that there was sufficient evidence from which the jury could say that there was fraud in the procurement of the

notes.   This is not like the case of Bank of Polk v. Wood, 189 Mo. App. 62, cited by the plaintiff.   In that case the stallion was infected with a latent defect and at the time of its sale had Bright's Disease, the symptoms of which began to develop soon after the sale.   The stallion proved to be a non-producer but the real nature of the animal's ailment was not known until after the death of the horse when a post mortem examination was had. In that case at page 69 the court said—

"If the seller had reason to believe that the horse was not sound, or would prove to be a non-producer and did not intend to carry out his collateral warranty to exchange another horse therefor, and the plaintiff bought the note with knowledge of such design, that would make a case of fraud."

Again, on page 71—

"If the seller of the horse knew that he was not sound,   .   .   .   and concealed such fact from the defendant and sold the note to plaintiff before the horse's condition could be discovered, such facts would amount to fraud in the procurement of the note."

There is no question of a latent defect in the horse sold to deceased.   When deceased purchased him he attempted to make immediate use of him for the purposes for which he bought him but it developed from the outset that he was not a good producer.   He bred the stallion to twenty mares during the first season with results in only three cases and he tried him the second season with even less favorable results.   Under these facts the jury could well infer that the sellers of the horse knew that the stallion was not a 60 per cent foal getter or a good producer at the time they sold him to Woody for there is no suggestion in the record or by plaintiff in his brief of anything that would tend to explain why the stallion would be such a poor producer immediately after its sale to Woody if he was such a producer as was represented and warranted to Woody prior to its sale to him.   The action of the sellers showed a lack of sincerity on their part.   They agreed in the warranty in

case the stallion was not as warranted (and they must have known at the time that he was not) to give Woody a stallion equally as good or return his notes. Instead of retaining the notes so that this could be done they sold them to plaintiff.

The contract for the sale of this horse and the warranty were made in Nevada and the horse delivered there but when the sellers asked Woody to go to Illinois to view horses that they had there he did so but found that they had none as good as the one they represented and warranted the first horse to be. He communicated this fact to the sellers and offered to return the stallion he had purchased from them but instead of accepting the same and giving him one equally as good, they requested him to go to Ft. Worth, Texas, to view horses there owned by the sellers. Woody did not go to Ft. Worth. It would be unreasonable to say that the duty was upon Woody after having gone to Illinois to view horses there at the request of the sellers and at his own expense, the sellers not offering to pay the same, to go to Ft. Worth, Texas, and view other horses when he had no assurance that these horses would be any better than those in Illinois. The whole conduct of the sellers would indicate a lack of good faith on their part from the very beginning. We think there was ample evidence of fraud in the procurement of the notes sued upon and that the court properly refused to direct a verdict for plaintiff and did not err in giving defendant's instruction No. 6.

It is insisted that the court erred in giving defendant's instruction No. 5 withdrawing from the jury the deposition of plaintiff. In this connection it is insisted that defendant by reading the deposition of George W. Woody, the maker of the notes, waived the incompetency of plaintiff to testify and none of the testimony in plaintiff's deposition could have been questioned by Woody if he had been living. The deposition of plaintiff, Woody being dead, was not admissible in evidence (Linhard v. Ditmars, 229 S. W. 401; Edmonds v. Scharff, 279 Mo. 78; Kersey v. O'Day, 173 Mo. 560; Lieber v. Lieber, 239 Mo.

1.)   The introduction of the deposition of Woody made the testimony of plaintiff admissible only as to matters testified to by Woody in his deposition. [Coughlin v. Hauessler, 50 Mo. 126; Allen v. Chouteau, 102 Mo. 309; Stone v. Hunt, 114 Mo. 66, 72; Leahy v. Rayburn, 33 Mo. App. 55.] Plaintiff's deposition did not tend to controvert anything respecting the matters testified to by Woody and the court therefore properly withdrew the evidence contained therein from the consideration of the jury.   However, plaintiff says, "If the deposition proved fraud then certainly the deposition of Mr. Ferry was competent to prove that he knew nothing about it. This was the same point and the same subject-matter." In his deposition Woody did not testify that Ferry knew of the fraud. It is apparent that Ferry's deposition did not tend to contradict anything Woody said in his deposition.   The rule that the surviving party to the proceeding is only incompetent to testify to the extent that his testimony might be subject to question by the other party if living (Elsea v. Smith, 273 Mo. 396) has no application where an administrator is a party to the suit. That rule has application to the first provision of section 5410, Revised Statutes 1919, and has no application where an executor administrator is a party to the suit.   This distinction is fully explained in Weiermueller v. Scullin, 203 Mo. 466, 474.  [See, also, Linhard v. Ditmars, supra; Williams v. Moore, 203 S. W. 824; Chandler v. Hedrick, 187 Mo. App. 664; Kersey v. O'Day, supra; St. Joseph v. Baker, 86 Mo. 310.]

After this deposition was excluded there was no evidence left in the case to show that plaintiff was the holder of the notes in due course or anything further than that he was a mere assignee of the notes.  The affidavit of the sellers, which was introduced in evidence, established only the naked indorsement.  [Sec. 5380, R. S. 1919; New Albany Woolen Mills v. Meyers & Co., 43 Mo. App. 124, 128.]

Section 845, Revised Statutes 1919, provides—

"Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any

person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course."

Section 841, Revised Statute 1919, provides—

"The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud, duress or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

Under these provisions of the statute, defendant having shown that the notes were obtained by fraud, the burden was upon plaintiff to show that he acquired the title as holder in due course. Section 838n, Revised Statutes 1919, provides—

"A holder in due course is a holder who has taken the instrument under the following conditions. (1) That it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Plaintiff did not sustain the burden of proving that he was the holder in due course, and finding no error the judgment must be affirmed and it is so ordered. All concur.